IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

CHRISTOPHER DUNCAN,          )
                             )
            Plaintiff,       )
                             )
     v.                      )   Case No.
                             )   10-3312-CV-S-REL-SSA
MICHAEL J. ASTRUE, Commissioner )
of Social Security,          )
                             )
            Defendant.       )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Christopher Duncan seeks review of the final
decision of the Commissioner of Social Security denying
plaintiff's application for disability benefits under Titles II
and XVI of the Social Security Act ("the Act"). Plaintiff argues
that the ALJ erred in (1) considering plaintiff's daily
activities in finding him not disabled; (2) discounting the
opinion of plaintiff's treating physician, Dr. Daniel Schmidt;
and (3) in failing to consider the combined effect of all
plaintiff's impairments. I find that the substantial evidence in
the record as a whole supports the ALJ's finding that plaintiff
is not disabled. Therefore, plaintiff's motion for summary
judgment will be denied and the decision of the Commissioner will
be affirmed.

## I.    BACKGROUND

On August 27, 2007, plaintiff applied for disability
benefits alleging that he had been disabled since November 11,

2006.  Plaintiff's disability stems from neck and knee pain and depression.  Plaintiff's application was denied on November 6, 2007.  On June 25, 2009, a hearing was held before an Administrative Law Judge.  On July 15, 2009, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On June 8, 2010, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into

consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

**III. *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS***

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other

3

type of substantial gainful activity in the national economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.  Is the claimant performing substantial gainful activity?

                Yes = not disabled.
                No = go to next step.

2.  Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

                No = not disabled.
                Yes = go to next step.

3.  Does the impairment meet or equal a listed impairment in Appendix 1?

                Yes = disabled.
                No = go to next step.

4.  Does the impairment prevent the claimant from doing past relevant work?

                No = not disabled.
                Yes =  go to next step where burden shifts to Com-missioner.

4

5.   Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.  *THE RECORD*

The record consists of the testimony of plaintiff, his grandmother Dorothy Duncan, and vocational expert Delores Gonzales, in addition to documentary evidence admitted at the hearing.

## A.  *EARNINGS RECORD*

The record shows that plaintiff earned the following income from 1991 through 2009:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1991 | $ 1,845.13 | 2001 | $24,842.58 |
| 1992 | 5,035.87 | 2002 | 23,927.05 |
| 1993 | 7,081.68 | 2003 | 18,147.82 |
| 1994 | 12,449.20 | 2004 | 13,304.32 |
| 1995 | 14,614.65 | 2005 | 15,156.37 |
| 1996 | 16,469.58 | 2006 | 20,974.88 |
| 1997 | 20,107.92 | 2007 | 2,270.00 |
| 1998 | 21,797.57 | 2008 | 0.00 |
| 1999 | 22,845.66 | 2009 | 0.00 |
| 2000 | 24,710.32 | | |

(Tr. at 139).

**B.    *SUMMARY OF MEDICAL RECORDS***

On September 28, 2005, Curtis Mather, D.O., at Lake Regional Health System performed surgery "without complications" on plaintiff's left knee for patellar tendinitis (Tr. at 278-79).

During a follow-up visit on October 17, 2005, plaintiff had full range of motion in the left knee and reported that "[t]he pain that he was having preoperatively [wa]s significantly improved." (Tr. at 277).  Plaintiff was asked to return in one month or sooner if he had "trouble."  The records do not show that plaintiff returned to the office.

November 11, 2006, is plaintiff's alleged onset of disability.  This is 13 months after plaintiff's knee follow-up.

On November 20, 2006, plaintiff had his first appointment with Daniel Schmidt, M.D., at Central Ozarks Medical Center following surgery on the cervical spine by another physician (Tr. at 303).  Plaintiff fractured his C6 and C7 vertebra and scapula after he fell 20 to 25 feet from a deer stand.  Plaintiff was prescribed hydrocodone (narcotic), OxyContin (narcotic), and Flexeril (muscle relaxer) and was told to wear a neck brace for three months.

Plaintiff continued his treatment with Dr. Schmidt and on January 16, 2007, reported that his pain medication had been "stolen again" (Tr. at 302).  Dr. Schmidt referred to it as a

6

"story" of his "OxyContin 20 and 40 mg and Oxycodone pills being stolen from his vehicle while briefly away from it at the supermarket. . . . When I entered the exam room he was leaning over the trash can and claimed he had just thrown up into it." Although Dr. Schmidt noted, "I am aware that he has claimed stolen medications at least twice before", he refilled plaintiff's Oxy-IR (instant release form of narcotic) and OxyContin 40 mg and gave him a prescription for Phenergan for nausea because plaintiff indicated concern over withdrawal symptoms. He discontinued plaintiff's OxyContin 20 mg.

On February 9, 2007, plaintiff saw Sami Khoshyomn, M.D., of St. John's Spine Center who had three months prior performed an anterior posterior spine stabilization and fusion surgery at C6-7 and was "very happy with [plaintiff's] improvement" (Tr. at 308). Plaintiff was "very satisfied" with his improvement and progress. Dr. Khoshyomn told plaintiff he no longer needed to use the cervical collar. Although Dr. Khoshyomn recommended physical therapy to improve the range of motion in plaintiff's neck, plaintiff declined and said he would do exercises at home. Dr. Khoshyomn expressly released plaintiff to return to work and did not identify any work restrictions or exertional limitations (Tr. at 308). He told plaintiff to come back in six months to repeat the x-ray of the cervical spine, or to come back sooner if

plaintiff had problems. Dr. Khoshyomn reported all of this in a letter to Dr. Schmidt.

Plaintiff returned to Dr. Schmidt on February 26, 2007, and he was diagnosed with gastroenteritis after reporting nausea and vomiting for the past day and a half (Tr. at 301). Dr. Schmidt prescribed Phenergan.

Plaintiff returned to Dr. Schmidt on March 6, 2007, with complaints of recurrent disturbed sleep (Tr. at 300). "Here for OxyContin, Oxy-IR script refills, also noting recurrent disturbed sleep, only 'one hour last night.' He recalls Trazodone being helpful in the past and this was stopped at the time of his C-spine surgery in mid November." Formal exam was expressly deferred. Dr. Schmidt diagnosed plaintiff with chronic pain, knee arthritis, chronic insomnia and recent C-spine surgery. He prescribed OxyContin, Oxy-IR and Trazodone.

On March 19, 2007, plaintiff told Dr. Schmidt he had suffered a loss of feeling in his left leg causing him to fall twice three days ago (Tr. at 299). Plaintiff asked to be put back on the OxyContin 20 mg plus the 40 mg OxyContin. "The patient appears to have full use of arms and legs. Walked in the hallway without limping. Has good neck range of motion." Despite assessing, "STORY OF RECENT FALLS WITH LEFT NECK

Case 6:10-cv-03312-REL   Document 17   Filed 09/04/11   Page 8 of 55

DISCOMFORT", Dr. Schmidt increased the dosage of OxyContin at plaintiff's request (Tr. at 299).

Plaintiff returned to Dr. Schmidt on April 6, 2007 for a follow up (Tr. at 298). Plaintiff felt that his shoulder and neck were better, and he said he had not had anymore falls or leg numbness. Dr. Schmidt deferred formal exam and wrote prescriptions for OxyContin 20 + 40 mg. twice a day, Oxy-IR, and Trazodone which plaintiff said was helping him sleep.

On May 4, 2007 plaintiff saw Dr. Schmidt for a medication refill (Tr. at 297). Plaintiff noted that he still had discomfort across his shoulder but could move his neck fairly well although he was laid up for several days after "participating in a benefit golf tournament at Tan-Tar-A recently." Dr. Schmidt noted that plaintiff appeared to have good neck motion but deferred formal exam. He wrote prescriptions for OxyContin 20 + 40 mg twice a day and Oxy-IR. "[D]id offer to discontinue the 20 mg dose which patient prefers to continue."

On June 1, 2007 plaintiff saw Dr. Schmidt for medication refills (Tr. at 296). "Here for medication refills, still notes lower neck discomfort at times, but no new changes otherwise." Formal exam was deferred, and Dr. Schmidt refilled plaintiff's OxyContin 20 + 40 mg and Oxy-IR.

9

Plaintiff returned to St. John's Spine Center on August 10, 2007, for a follow-up visit on his cervical spine surgery (Tr. at 311). He reported "getting along well" for the last six months, but he had increasing neck pain and migraine headaches after "helping his friends move a hot tub and he had to do a lot of heavy lifting" (Tr. at 311). Plaintiff also indicated that he worked in heavy construction and did not feel he could "go back and do this because of his recurrent problems" (Tr. at 311). As a result, he was "in the process of trying to find a different line of employment." (Tr. at 311). Upon physical examination, plaintiff had normal mood and affect and was alert and oriented (Tr. at 311). Plaintiff ambulated "without difficulty," but had a decreased range of motion in the cervical spine (Tr. at 311). X-rays showed "good bony fusion taking place" and disk spaces "appear to be doing well" (Tr. at 311). "From a surgical standpoint, he appears to be coming along well." (Tr. at 311). Dr. Khoshyomn urged physical therapy again, but plaintiff again declined despite his admission that he had not been "diligent" about home exercises (Tr. at 311).

On August 20, 2007 -- one week before he applied for disability benefits -- plaintiff reported to Dr. Schmidt that he had memory disturbances, which he attributed to "several accidents" during which he had hit his head "fairly hard" (Tr. at

315-316).  Plaintiff also said he was "depressed at times, moody, basically frustrated over his orthopedic doctor stating he needs to quit the physical type work he has been doing, but his disturbed memory limits other desk-type work also."  Without performing any tests whatsoever, Dr. Schmidt assessed memory loss, head injury history, daily mixed headaches, chronic neck and knee arthritis, and underlying depression.  Dr. Schmidt prescribed Celexa for depression and Aricept for memory disturbances.  Because plaintiff requested it, Dr. Schmidt gave him an injection of Toradol for headache relief.

On August 27, 2007, plaintiff filed his application for disability benefits.

On September 25, 2007, plaintiff saw Dr. Schmidt for a "check up" (Tr. at 314).  Plaintiff reported that Celexa was helping with depression although he had run out of pills one week before the appointment.  Plaintiff again claimed he had several head injuries that involved "brain swelling" and said that Aricept had not helped with memory issues.  Plaintiff was described as an "alert, pleasant, non-ill appearing male." Despite performing no tests at all, Dr. Schmidt assessed chronic pain, neck and knee arthritis, memory disturbance, head injury history, and depression.  Celexa was restarted and plaintiff was asked to return in five weeks.  Dr. Schmidt also gave plaintiff

11

prescriptions for OxyContin 20 + 40 mg and Oxy-IR "which are due in one week."

On November 6, 2007, State agency psychologist, Kenneth Burstin, Ph.D., completed a psychiatric review assessment (Tr. at 317-328). He concluded that plaintiff had a non-severe medically determinable impairment of depression that improved on medication (Tr. at 327). He also noted that the medical record did not support the claim of head injury, to which plaintiff attributed memory deficits (Tr. at 327). Dr. Burstin opined that plaintiff had mild restrictions in activities of daily living; mild difficulties in social functioning; mild deficiencies in concentration, persistence, or pace; and no episodes of decompensation of extended duration (Tr. at 325). That same day, plaintiff's application for disability benefits was denied.

On November 27, 2007, plaintiff returned to Dr. Schmidt for a pain medication refill and a letter supporting disability (Tr. at 363). Plaintiff apparently had stopped taking Celexa, his depression was "stable," and Celexa was not refilled. "[R]efill prescriptions for oxyContin 20 mg #60, 40 mg #60, Oxy-IR 5 mg #120 all dated today per patient request. Will also dictate letter to Social Security Disability on his behalf."

That same day, November 27, 2007, Dr. Schmidt wrote a letter to whom it may concern:

12

Mr. Duncan sustained significant compression fractures of his VI and VII vertical *[sic]* vertebrae in a fall from a height in November 2006. Since then he has had persisting neck pain and headaches making it impossible to sit for any duration or stand and move about for any duration either. He also notes memory disturbance, more so since the fall even and depression. With these symptoms plus his chronic pain medications he would find it not possible to maintain steady gainful employment of either desk work or active physical labor.

(Tr. at 335).

On December 6, 2007, plaintiff requested a hearing by an administrative law judge (Tr. at 93).

On Friday, January 4, 2008, plaintiff saw Dr. Schmidt "for review of disability form to be completed" for the hearing plaintiff said was scheduled three days hence, and complaining of a rash and cold symptoms (Tr. at 362). Dr. Schmidt performed a physical exam of plaintiff's neck (finding it supple without adenopathy [enlargement of the lymph node] - no mention was made of neck pain, range of motion, stiffness, tenderness, or any other neck condition related to plaintiff's impairment), lungs, heart, and torso skin. He did not examine plaintiff's knee. He and assessed "scarlatina rash suspect" and "chronic neck and knee pain - disability visit". Plaintiff "noted" more pain recently; therefore, Dr. Schmidt "allow[ed] increase adding Oxycontin 20 mg b.i.d. [twice a day] to his 20 + 40 mg b.i.d. current schedule #50 only as his refill is just here December 27 [eight days ago] and continue he *[sic]* Oxy IR 5 mg breakthrough pills." Dr.

13

Schmidt completed plaintiff's disability form.

In that questionnaire completed by Dr. Schmidt on January 4, 2008, he assessed plaintiff's ability to perform certain work-related physical functions (Tr. at 337-41). He estimated plaintiff could occasionally lift and/or carry up to 20 pounds, but could never carry anything heavier than 20 pounds and could not frequently carry any weight. When asked to indicate the signs, symptoms or medical findings supporting these conclusions, Dr. Schmidt wrote, "chronic neck pain."

He found that plaintiff could sit for a maximum of two hours per day, stand for a maximum of two hours per day, walk for a maximum of two hours per day, and "work" for a maximum of two hours per day. There is no definition of "work" on this form. When asked to indicate the signs, symptoms or medical findings supporting these conclusions, Dr. Schmidt wrote, "Pts neck pain makes it impossible to sit still or stand still for longer than 1/2 to one hour at any one interval."

He found that plaintiff could use his hands for repetitive grasping and fine manipulation but could not push or pull. When asked to indicate the signs, symptoms or medical findings supporting these findings, Dr. Schmidt wrote, "the pushing/ pulling repetitively would aggravate neck pain." Dr. Schmidt found that plaintiff could operate foot controls with his right

14

leg but not his left.  When asked to indicate the signs, symptoms or medical findings supporting these conclusions, Dr. Schmidt wrote, "Pt also has chronic knee arthritis and prior knee surgeries (left side)".

Dr. Schmidt found that plaintiff could never bend, squat, crawl, climb, reach above, stoop, crouch, or kneel.  When asked to indicate the signs, symptoms or medical findings supporting these findings, he wrote, "neck injury and pain and knee pain". He found that plaintiff could have no exposure at all to unprotected heights, moving machinery, marked temperature changes, or driving automotive equipment.  He could, however, occasionally be exposed to dust, fumes, gases and noise.  When asked to indicate the signs, symptoms or medical findings supporting these conclusions, Dr. Schmidt wrote, "see above".

Dr. Schmidt indicated that plaintiff's pain is "severe" and that he has a medically determinable physical impairment which could be expected to produce pain.  When asked to list the medically determinable physical impairments, Dr. Schmidt wrote, "c-spine post traumatic arthritis - injury Nov. 2006; several closed head injuries → suspect related to memory disturbance now".  The form states, "From observable signs and your knowledge of patient, please indicate the severity of pain [he wrote, "severe"], duration of pain [he wrote, "hours"], frequency of

pain [he wrote, "multiple times through the day"]." When asked
if there were "objective indicators of pain" such as muscle
atrophy, reduced range of motion, motor disruption, muscle spasm,
sensory disruption, or other, Dr. Schmidt left all of those
choices blank. The next question asked for subjective signs; and
Dr. Schmidt checked complaints of pain, sleeplessness, poor
interpersonal relationships, and irritability.

When asked what limitations were imposed on the patient in
walking, standing, lifting, bending, sitting, pace and stamina,
Dr. Schmidt wrote, "see prior answers." When asked what
limitations were imposed in concentrating, remembering,
reasoning, and following instructions, Dr. Schmidt wrote,
"affected by chronic pain and pain medications, patient has
difficulty remembering details." When asked what limitations
were imposed in interacting with others, socializing, personal
hygiene and other psychological effects, Dr. Schmidt wrote, "not
affected too much." Dr. Schmidt indicated that "sitting
prolonged, standing prolonged, bending" incite plaintiff's pain
and "rest, lying down" relieve his pain. The next question asked
what other pain relief measures have been recommended, i.e.,
physical therapy, bio feedback, pain management clinic, weight
loss, or diet, and what were the results. Despite plaintiff
having refused physical therapy on several occasions, Dr. Schmidt

left this blank.

Finally, the form asks, "Are there specific medical reasons the patient should not work?" Dr. Schmidt checked, "yes" and wrote, "above mentioned chronic pain [illegible] (neck & knee), both physical and mental limits". (Tr. at 337-341).

On January 11, 2008, plaintiff saw Dr. Schmidt (Tr. at 360-361). Plaintiff reported crying for the past two days, increased stress and anxiety, and poor sleep. "Grandmother indicates his girlfriend of 3 year relationship up and left him yesterday and his grandmother was not at all supportive at the Social Security hearings, also one of the clerks at the DFS office was a bit harsh as well. He got upset and flushed all of his OxyContin down the toilet. Is still taking Celexa 20 mg daily for depression". Plaintiff cried throughout the 20-minute appointment. Dr. Schmidt did not perform any exam or testing. he assessed:

1.  Acute stress reaction, nervous break.

2.  Contributing factors - girlfriend relationship breakup, disability frustrations, chronic neck and knee pain, family stressors.

Dr. Schmidt recommended plaintiff go to the Rolla Stress Center, but plaintiff "currently declines/refuses". Dr. Schmidt prescribed Ativan for anxiety, he increased plaintiff's Celexa, he refilled plaintiff's OxyContin and Oxy-IR since plaintiff

17

claimed to have flushed his down the toilet.

On January 21, 2008, plaintiff reported to Dr. Schmidt that he was not doing better, but his family thought that he was (Tr. at 358). He reported having been out of medication for the past three days. "His grandmother, private from interaction with patient now, expresses concern for him acting sleepy a lot but worried that he is on too much pain medication. She . . . is absolutely sure about drug use". Dr. Schmidt observed that plaintiff had some slow reactions and mild speech slurring, although he was interactive. Dr. Schmidt reduced plaintiff's dose of Ativan and refilled plaintiff's Oxycontin "40 mg only p.o. [by mouth] B.I.D. [twice a day] #20 (as grandmother is paying for his medications and can only afford supply until end of month). Also, Oxy IR 5 mg 2 p.o. q [every] 12 hours p.r.n. [as needed] breakthrough pain #40. The patient accepts the Oxycontin lower dose of 40 mg only rather than 60 or even 80 mg b.i.d. but states he will 'not be able to do anything other than lay [sic] on the couch all day."

Plaintiff saw Dr. Schmidt on February 1, 2008, for a follow up on stress and depression (Tr. at 357). Plaintiff reported more crying spells the last three days. He ran out of Ativan and his grandfather gave him two Lorazepam which calmed him. "His neck and knee pain are stable." "Formal exam deferred." Dr.

18

Schmidt assessed depression with anxiety features, chronic pain, and rash, resolved. He refilled plaintiff's OxyContin 40 mg, Oxy IR, and Ativan, and he increased plaintiff's Celexa to 60 mg daily. "[Plaintiff's] Grandmother anticipates hearing if he will get Medicaid coverage in the next week or so and have discussed counseling through Pathways if this happens, otherwise followup here in one month. Also, still the option of the Rolla Stress Center."

By February 28, 2008, plaintiff reported better mood and anxiety (Tr. at 356). "Here for followup and better with mood and anxiety. He even would like to try reducing Oxycontin from 40 to 20 mg twice daily, still finds the breakthrough IR pills helpful. He notes to his grandmother, also here today that he stopped Celexa pills as well. They recently got notice of disability determination denial." Dr. Schmidt performed no exam. He assessed depression with anxiety, improving; chronic cervical spine and left knee arthritis pain; and disability claim followup. Plaintiff's Ativan, OxyContin, and headache medication (Trazodone and Elavil) prescriptions were refilled; he was told to remain off the Celexa.

A little over two months later, on May 6, 2008, plaintiff returned to Dr. Schmidt for a medication consult (Tr. at 355). Plaintiff had complaints of more neck pain and stiffness and

wanted to return to 40 milligrams of Oxycontin. His mood was stable being off Celexa and his nerves were stable on Ativan. Dr. Schmidt deferred formal exam and wrote plaintiff a prescription for the increased OxyContin as requested.

Two months later, on July 8, 2008, plaintiff reported some intermittent fluid retention in his legs below the knees "when he is up and attempting to work around the home place such as weed-eating around the lake" (Tr. at 354). Plaintiff said he likes to add salt to his food, he eats junk food, and he drinks six to eight regular Dr. Peppers per day. On examination, plaintiff's legs appeared "stable" with just trace pedal edema. Plaintiff did not mention neck pain or knee pain. Plaintiff was advised to reduce salt, starch, sweets, and soft drinks. He was started on HCTZ, a diuretic, and Dr. Schmidt wrote a new prescription for Oxy-IR.

Nine days later, on July 17, 2008, Dr. Schmidt observed that plaintiff had stopped taking Celexa for depression and Ativan for anxiety "a while back" (Tr. at 351-352). Plaintiff was reporting more moodiness and temper outbursts. "He notes more neck and knee pain even taking Oxycontin 40 mg twice daily which he has been on several years. He recalls being on IV morphine in the hospital in the past with good tolerance." Dr. Schmidt deferred a formal exam. He assessed depression with anxiety features and

chronic neck, knee pain, degenerative arthritis. He restarted plaintiff's Celexa and Ativan, he switched OxyContin to MS Contin (morphine) 60 mg twice a day, and he noted that plaintiff should still have Oxy-IR pills because his last prescription had just been written nine days earlier.

Two weeks later, on July 31, 2008, plaintiff was seen by someone[1] in Dr. Schmidt's office (Tr. at 353). Plaintiff complained of nausea, vomiting and diarrhea for three days. "[T]hinks it may be from morphine. He switched a couple weeks ago from OxyContin to morphine because the OxyContin was not working as well." Plaintiff had no abdominal tenderness and no indication of appendicitis (negative obturator sign left and right). He was assessed with gastroenteritis. "Before he becomes dehydrated I would like to get some medicine in him and have told him there is the option of having an IV with fluids as well as IV medications, he does not wish that. His mother is with him and states she will take him home if we will give him a shot." Plaintiff was given a shot of Phenergan for nausea as well as a prescription for Phenergan capsules.

On August 7, 2008, plaintiff saw Dr. Schmidt for a follow up (Tr. at 350). Plaintiff reported he had spent three days in the

---

[1]Plaintiff indicates he saw Dr. Barton L. Warren; however, I see no signature, initials, etc., which would indicate what doctor treated plaintiff this day.

21

hospital for a small bowel obstruction most likely due to
morphine pills.  Plaintiff's exam was normal.  His mother
completed a mental health questionnaire noting "yes" to eight
screening questions for depression.  Dr. Schmidt assessed small
bowel obstruction, morphine intolerance, chronic pain and
depression.  He refilled plaintiff's Oxy-IR.  "Will pursue
getting drug assistance for trial of Wellbutrin antidepressant
noting he also smokes.  Have also recommended they pursue
caseworker on status of his Medicaid application and disability
still in process."

On September 13, 2008, plaintiff was admitted to Cox Health
Systems after having suffered a gunshot wound (Tr. at 368-397).
Under history of present illness, the record says, "The patient
is a 33-year-old gentleman with a history of traumatic brain
injury after falling from a tree stand.  This has led to some
forgetfulness.  He was working with his .22 gauge weapon at home
and inadvertently fired a hollowpoint bullet into his left leg
when the dog jumped on him. . . .  CT scan shows significant
bullet fragments in near proximity to the vessel but no
compromise or extravasation of the vessels."  Plaintiff reported
taking no medications currently, despite having gotten a refill
of Oxy-IR a month earlier.  "He is known to use pain medications
in a generous fashion."  Plaintiff denied chest pain, shortness

of breath, focal neurologic deficit. "He has some forgetfulness and some memory loss problems. Informally noted chemical dependence. All others negative."

On exam plaintiff's neck was stiff. Plaintiff was alert, oriented, friendly and cooperative. Because plaintiff's blood vessels were not seriously impacted by the gunshot, Robert Vorhies, M.D., recommended symptomatic wound care and a clinic exam for follow up. Plaintiff was discharged on September 15, 2008, in stable condition, activity "as tolerated." His discharge medications included Oxy IR, OxyContin 40 mg twice a day, Lorazepam and Amitriptyline.

On September 23, 2008, plaintiff saw Dr. Schmidt for a follow up (Tr. at 348). Plaintiff complained that his pain was "not relieved too well" and at times he could not curl up his toes. He was assessed with chronic pain. Despite plaintiff having gotten prescriptions at the hospital eight days earlier for OxyContin and Oxy-IR, Dr. Schmidt refilled plaintiff's OxyContin, changed Oxy-IR to Roxicodone, and started Neurontin.

Three days later, on September 26, 2008, Dr. Schmidt wrote a letter to whom it may concern (Tr. at 343).

> Christopher continues to have memory disturbance. He
> sustained a life-threatening injury recently when he was
> cleaning his gun. He had made mental note to unload the
> firearm, but then forgot to do so and when his pet dog
> jumped up on a couch it dislodged the gun firing it into his
> leg causing significant bleeding. He saved his life by

23

quickly applying a tourniquet to the leg. He has described having memory disturbance before this as well and along with neck and low back pain, knee pain and now thigh pains from the gunshot wound continues to not be able to work gainfully.

On October 10, 2008, plaintiff saw Dr. Schmidt for a follow up, noting his left thigh was improving (Tr. at 347). "He would like to return to the OxyContin 20 mg b.i.d. schedule. He did not find Oxycodone worked any better for breakthrough pain and would like to return to Oxy-IR 5 mg as well. He thinks the Neurontin 300 mg may be helping a bit thus far, but just recently increased it from once daily to b.i.d. [twice a day]." Dr. Schmidt refilled plaintiff's OxyContin, refilled his Oxy-IR, and increased plaintiff's Neurontin.

On November 6, 2008, plaintiff saw Dr. Schmidt for a follow up and noted his left thigh was "healing well" (Tr. at 346). Other than occasional shooting pain down his left leg, he had "no other acute health concerns." Dr. Schmidt did not examine plaintiff's thigh. He assessed the gunshot wound as stable. He refilled prescriptions for plaintiff's OxyContin, Oxy-IR, Neurontin, Trazodone, and Elavil.

On November 14, 2008, plaintiff saw Dr. Schmidt regarding criminal charges (Tr. at 345). Plaintiff reported that he had been "served papers in court related to the altered prescription for his Oxycontin" (Tr. at 345). Although plaintiff stated that

24

he did not alter the prescription and was not sure how it happened, Dr. Schmidt recalled plaintiff having admitted altering the prescription.

On January 6, 2009, plaintiff was seen at Ozarks Medical Center by Lisa King, FNP, with complaints of vomiting and diarrhea (Tr. at 406). He was assessed with acute viral gastroenteritis with dehydration.

On February 6, 2009, plaintiff saw Dr. Schmidt for a refill of pain medication (Tr. at 405). Plaintiff requested additional pain medication because "his grandfather ha[d] been working him harder cutting firewood, etc." (Tr. at 405). Plaintiff also reported pain from a slip and fall on an icy porch "hitting the edge of the step across the shoulders" (Tr. at 405). No injury to the shoulders was noted (Tr. at 405). Plaintiff also reported a sharp pain in his left calf muscle, but no swelling was observed (Tr. at 405). Dr. Schmidt increased plaintiff's OxyContin and refilled his Oxy-IR.

Two weeks later, on February 17, 2009, plaintiff returned asking for an early refill of Oxy-IR claiming he had actually "landed flat on his back" when he slipped on the ice (Tr. at 403). Despite Dr. Schmidt finding no tenderness and an otherwise normal exam, he filled plaintiff's Oxy-IR early as requested.

Case 6:10-cv-03312-REL   Document 17   Filed 09/04/11   Page 25 of 55

In a letter dated April 28, 2009, to whom it may concern,

Dr. Schmidt wrote:

Chris notes ongoing daily pain or stiffness in the left
knee[2] related to degenerative arthritis.  He also notes
daily pain in his neck related to compression fractures of
C6 and C7 from a fall from a height November 2006.  He has
also had a number of head injuries and notes significant
memory disturbance.

Of all these reasons he has been unable to maintain gainful
employment with either physical activity or light desk duty.

(Tr. at 366).

On May 21, 2009, Dr. Schmidt noted that plaintiff needed an

early refill of Oxy-IR because plaintiff's "back hurts worse

usually after physical activity, yard work, longer trips to

recently see his grandfather in the hospital at lake, etc." (Tr.

at 401).  Formal exam was deferred.  Dr. Schmidt assessed chronic

cervical spine arthritis, left knee arthritis, and "smoker".  He

refilled plaintiff's Oxy-IR and also gave him a second

prescription to fill in 30 days.

On June 5, 2009, plaintiff saw Michael Wells, D.O., in Dr.

Schmidt's office complaining of low back pain (Tr. at 399-400).

Plaintiff said his knee problem was "stable."  He requested a

refill of Oxy-IR "as he says that allows him to at least

function."  Dr. Wells performed a physical exam which was normal.

---

[2]Plaintiff had not actually complained of knee pain since
July 17, 2008 - nine months earlier - and coincidentally, that
was on a day when he asked Dr. Schmidt to write another letter in
support of his disability application.

He observed that plaintiff could ambulate without difficulty although assuming the sitting position seemed to cause him some low back pain.  He had point tenderness in the lumbar spine from L3 to L5.  Plaintiff had x-rays which were normal and showed no fractures, dislocations, or arthritic processes.  The disk space was fairly well maintained and there were no congenital defects. Dr. Wells assessed degenerative joint disease in the cervical spine and knee, chronic pain, and rule out disk disease of the lumbar spine.  He told plaintiff to continue his previous medications.  He refilled the Oxy-IR with "no refill." and referred plaintiff to an orthopedist for evaluation of his low back.

On June 12, 2009, plaintiff admitted during an appointment for pain medication refill that he took excessive pain medication beyond the amount prescribed: "Admits he sometimes takes 3-4 Oxy IR (immediate release) 5 mg pill per dose" (Tr. at 398).  He reported trying to stay active mowing the yard, but he was "not doing any active low back exercise program."  He was given a back exercise sheet and Dr. Schmidt encouraged him to do these exercises.

## C.   *SUMMARY OF TESTIMONY*

During the June 25, 2009, hearing, the following individuals testified:  plaintiff, his grandmother Dorothy Duncan, and

vocational expert Delores Gonzales.

**1.    Plaintiff's testimony.**

At the time of the hearing, plaintiff was 34 years of age, 5'9" tall, 178 pounds, and had been divorced for about seven years (Tr. at 31, 33).  He had one child whom he saw every other weekend and for three months during the summer (Tr. at 31). Plaintiff lived alone in a double-wide mobile home (Tr. at 32). There were three steps leading up to the home which sits on his grandmother's farm (Tr. at 32).  Plaintiff had lived in the mobile home for ten or 11 years (Tr. at 32).  The farm was about 160 acres and was used by the family for hunting (Tr. at 40). Plaintiff's grandmother lived across the road from him (Tr. at 65).  She takes plaintiff to his doctor appointments because she wants to go (Tr. at 66).  Plaintiff sometimes eats at her house, she helps with dishes sometimes, and she vacuums sometimes (Tr. at 66).  Plaintiff mainly takes care of his own home (Tr. at 66).

Plaintiff has a high school education (Tr. at 33).  He was receiving food stamps and was on Medicaid (Tr. at 34).  He previously worked as a heavy equipment operator (Tr. at 34-35). Plaintiff last worked in 2006 and left his job when he broke his neck (Tr. at 36).  Plaintiff fell out of a tree stand while deer hunting and fell 25 feet (Tr. at 36-37).  Before his job as heavy equipment operator, plaintiff drove a concrete truck for about

28

four years (Tr. at 37).  He drove a truck for a propane company,
and he also spent five years working as a corrections officer at
Algoa Correctional Center in Jefferson City (Tr. at 38-39).  Each
time plaintiff switched jobs, it was for better pay (Tr. at 39).
The trucks he drove were stick shift trucks with a clutch (Tr. at
64).

For about a month and a half in 2007 plaintiff worked as a
welder and he helped put docks together (Tr. at 41).  This was
six months after he broke his neck and he had tried to go back to
work (Tr. at 42).  Although he worked eight hours a day, he did
not work full 40-hour weeks (Tr. at 61).  He quit because he was
not able to do it (Tr. at 41-42).

The ALJ observed that plaintiff was very tan, and plaintiff
said he walks around outside or sits in the yard watching his two
dogs run around (Tr. at 42).  He does not like to be inside (Tr.
at 42).  Plaintiff has a car but he does not drive it because he
has no insurance and the car is not registered (Tr. at 43).  His
mother or grandparents help him get around (Tr. at 43).

Plaintiff has had back pain since he broke his neck, and it
has gotten worse (Tr. at 43).  Plaintiff had surgery when he
broke his neck -- the doctors took a piece of bone out of his hip
to remake part of the vertebrae in his neck (Tr. at 44).
Plaintiff testified he was taking Oxycodone and OxyContin for his

Case 6:10-cv-03312-REL   Document 17   Filed 09/04/11   Page 29 of 55

pain and that he had been on the pain pills since he was 21 because of four knee surgeries (Tr. at 44). Plaintiff had two arthroscopic surgeries and two regular surgeries on his left knee (Tr. at 44). The surgeries were about 12, 10, 8 and 6 years ago (Tr. at 44-45). Plaintiff always has a limp due to his knee, and he cannot carry anything because of the knee strain (Tr. at 45). Sometimes it swells up to two or three times its normal size and plaintiff cannot walk at all (Tr. at 45). He was able to get the above jobs driving tick shift trucks despite having this knee problem (Tr. at 46).

About a year before the hearing, plaintiff was shot in the left leg with a .22 (Tr. at 46). He was sitting on his couch cleaning a loaded rifle when his dog jumped on the couch (Tr. at 46-47). Plaintiff suffers from depression because he does not have any money (Tr. at 48). He takes Lorazepam and Trazodone (Tr. at 48). He has nerve pain in his foot and leg pain, and that is another reason he takes the pain medication (Tr. at 49). Plaintiff told the ALJ he has no side effects from his medication (Tr. at 49). He later testified on questioning by his attorney that his pain medication causes him to be tired and he takes naps during the day for an hour or two (Tr. at 67). He gets up every couple of hours at night due to discomfort (Tr. at 68).

30

Plaintiff has a TENS unit that he uses on his leg and knee, but he has never used it on his back (Tr. at 50).

Plaintiff can stand for 10 to 15 minutes, walk about a half a mile (for 10 to 15 minutes), and sit for 30 minutes at a time (Tr. at 51). Plaintiff can lift a gallon of milk (Tr. at 52). He goes camping once in a while with his 12-year-old daughter on his grandmother's property on the Gasconade River (Tr. at 52). Plaintiff's 12-year-old takes care of him while she is with him over the summer (Tr. at 53).

Plaintiff smokes a pack of cigarettes per day (Tr. at 55). Plaintiff rarely drinks (Tr. at 56). He has a driver's license and he drives (Tr. at 56). Plaintiff shops once a week for beverages, milk and small items; does a little cooking in the microwave; does his own laundry; and takes care of his half-acre yard with a riding lawn mower (Tr. at 56-57, 58). Plaintiff mows half the yard one day and the other half a couple days later (Tr. at 58).

Plaintiff is unable to work because no one can depend on him to be there five days a week due to his pain (Tr. at 62). Plaintiff rated his pain as a 7 or 8 (with 10 being hospitalizing pain) even with his pain medications and lack of activity (Tr. at 63). Rain and cold weather increase his pain (Tr. at 64).

**2. Dorothy Duncan's testimony.**

Ms. Duncan's house is about three blocks' distance from plaintiff's house, and she sees him every day (Tr. at 70). Plaintiff cries sometimes (Tr. at 70). One time Ms. Duncan sat with him all afternoon and night while he cried and then took him to the doctor the next day (Tr. at 70-71). Plaintiff has problems remembering appointments and does not remember what doctors tell him (Tr. at 71). When asked if there was anything else about him that had changed since he was healthier, Ms. Duncan said,

> Money problems. He doesn't, he doesn't realize a dollar or anything anymore. I mean, we could give him money, if we gave him $20 to go buy us a loaf of bread, he wouldn't bring us back anything.

(Tr. at 72). Plaintiff's counsel questioned Ms. Duncan further, inquiring whether she now, because of that, questioned plaintiff's judgment and perhaps thought he was acting more childlike (Tr. at 72).

Ms. Duncan testified that when plaintiff shot himself in the leg, he did not seem to be suffering from depression (Tr. at 73). Upon further questioning, she said "I, you know, I don't know, I didn't have time to really think, I don't guess, I was so scared. And, of course, we got, they flew him into the hospital and I guess maybe I thought it wasn't an accident really. I thought maybe because of the depression. . ." (Tr. at 74).

32

**3.    Vocational expert testimony.**

Vocational expert Delores Gonzales testified at the request of the Administrative Law Judge.

The first hypothetical involved a person who could lift 20 pounds occasionally and 10 pounds frequently; stand or walk for six hours per day; sit for six hours per day; occasionally climb ramps and stairs, stoop, kneel, or crouch; never crawl or climb ropes, ladders or scaffolds; and must avoid concentrated exposure to extreme cold, wetness and vibration (Tr. at 78-79).  The vocational expert testified that such a person could not perform plaintiff's past relevant work (Tr. at 79).  However, the person could work as an usher, D.O.T. 344.677-014, with 101,530 in the nation, 2,820 in Missouri, and 420 in non-metropolitan central Missouri (Tr. at 79).  He could be a fast food worker, D.O.T., 311.472-010, with 2,708,840 in the nation, 84,820 in Missouri, and 6,520 in non-metropolitan central Missouri (Tr. at 79).

The second hypothetical involved a person with the same limitations as the first except that the person could lift only 10 pounds occasionally and would need a sit/stand option with the ability to change positions frequently.  The person should avoid even moderate exposure to extreme cold, wetness and vibration (Tr. at 79-80).  The vocational expert testified that such a person could be an order clerk, D.O.T. 209.567-014, with 254,520

33

in the nation, 7,130 in Missouri, and 820 in non-metropolitan
central Missouri (Tr. at 80). The person could also work as a
callout operator, D.O.T. 237.367-014, with 67,400 in the nation,
1,190 in Missouri, and 300 in non-metropolitan central Missouri
(Tr. at 80).

The third hypothetical involved a person with the same
limitations as in the second hypothetical but was limited to
understanding, remembering and carrying out simple instructions
and performing nondetailed tasks, could make simple work-related
decisions, and could perform work at a normal pace without
production quotas (Tr. at 80). The vocational expert testified
that the order clerk and callout operator jobs would have quotas,
but the person could be a surveillance system monitor, D.O.T.
379.367-010, with 85,440 in the nation, 2,020 in Missouri, and
200 in non-metropolitan central Missouri (Tr. at 80).

The fourth hypothetical involved a person with the same
limitations as the third hypothetical but who would have up to
two absences per week due to pain and could not concentrate or
pay attention for longer than two hours at a time (Tr. at 81).
The vocational expert testified that such a person could not work
(Tr. at 81).

The final hypothetical involved a person who could not
remember any instructions of any kind (Tr. at 82). The

34

vocational expert testified that such a person could not work
(Tr. at 82).

## V.    *FINDINGS OF THE ALJ*

Administrative Law Judge Victor Horton entered his opinion
on July 15, 2009 (Tr. at 11-22).

Step one.  Plaintiff has not engaged in substantial gainful
activity since his alleged onset date (Tr. at 13).  His
subsequent earnings were below the substantial gainful activity
level (Tr. at 13).

Step two.  Plaintiff has status/post fusion surgery on the
cervical spine and status/post surgeries on the left knee, severe
impairments (Tr. at 13).  Plaintiff's mental impairment is not
severe (Tr. at 13-14).

Step three.  Plaintiff's impairments do not meet or equal a
listed impairment (Tr. at 14).

Step four.  Plaintiff retains the residual functional
capacity to perform light work (Tr. at 14).  He can lift up to 20
pounds occasionally and up to ten pounds frequently; sit for six
hours per day; stand or walk for six hours per day; occasionally
climb stairs or ramps, stoop, kneel, or crouch; cannot climb
ropes, ladders or scaffolds or crawl.  He must avoid even
moderate exposure to extreme cold, wetness and vibration (Tr. at
14).  Plaintiff's subjective complaints of disabling symptoms is

35

not credible (Tr. at 15-20).  With this residual functional capacity plaintiff cannot return to his past relevant work (Tr. at 20).

Step five.  Plaintiff can perform other jobs in the local and national economies which exist in significant numbers, such as usher or fast food worker (Tr. at 21-22).

## VI.  CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988);  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment

36

unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence.  Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ.  In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> The claimant's allegations regarding pain in the neck are partially credible. Clinical evidence does indicate that the claimant was previously treated for a cervical fracture, which would account for pain in this area. However, symptoms, including pain, will be determined to diminish the capacity for basic work activities only to the extent that the alleged functional limitations and restrictions due to symptoms such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence. 20 CFR 404. 1529(c)(4) and 416.929(c)(4). Reduced joint motion, muscle spasm, sensory deficit and motor disruption are useful indicators to assist in making reasonable conclusions about the intensity and persistence of symptoms and the effect those symptoms, such as pain, may have on the ability to work. 20 CFR 404. 1529(c)(2) and 416.929(c)(2).

> The objective evidence does not support a finding that the claimant is limited by pain to the degree he alleges. Those who have examined the claimant have not identified an underlying basis for pain at this level of severity nor has comprehensive testing indicated such.

> The claimant's primary care physician has provided the claimant with ongoing care for his pain. Treatment has consisted mostly of refilling prescriptions for strong narcotic medication. There is evidence that the claimant may be motivated by more than just a need for pain relief to seek such medication. At a visit with Dr. Schmidt on January 16, 2007, the claimant reported that his OxyContin and Oxycodone pills had been stolen from his vehicle while he was at the grocery store. Dr. Schmidt observed that the claimant had "claimed stolen medications at least twice before". This suggests that the claimant might have become addicted to his prescription medications. At a visit with Dr. Schmidt on January 21,2008, the claimant's grandmother expressed concern that the claimant was on too much pain medication. Notes show that the claimant often reported that he had run out of medication earlier than expected.

* * * * *

The claimant's own failure to comply with treatment recommendations may also play a role in any delay in his anticipated progress.  Mr. Strecker observed that the claimant had been referred for physical therapy but had declined as he requested to handle this himself at home. However, when asked about this, the claimant admitted that he had not been as diligent about this as he probably needed to be.  A claimant who fails to follow prescribed treatment for a remediable condition which would restore the ability to work, without good reason, is not under a disability. Roth v. Shalala, 45 F.3d 279, 282 (8th Circuit 1995); Weber v. Harris, 640 F.2d 176, 178 (8th Circuit 1981).

* * * * *

An examination of the claimant's daily activities also provides evidence that he is capable of functioning at a level that would not preclude sustained work activity.  The claimant testified that he lived by himself in a double-wide trailer.  He said that he does some cooking, laundry, and lawn-mowing using a riding lawn mower.  He said that he takes his 12-year old daughter camping sometimes on the Gasconade River, which would likely entail some lifting, hiking, and possibly use of a water craft.  At the hearing, the claimant testified that . . . he never used a weed-eater as a neighbor was hired to perform this task.  However at a visit in July 2008 he told Dr. Schmidt that he had been weed-eating around the lake.  Such inconsistent statements do not bode well for the claimant's general credibility.  At a visit in May 2007, Dr. Schmidt observed that the claimant could "move his neck fairly well although [he] was laid up for several days after participating in [a] benefit golf tournament at Tan-Tar-A recently".  At his visit with Mr. Strecker in August 2007, the claimant reported some exacerbation of symptoms after performing heavy lifting while helping friends move a hot tub.  The claimant has indicated that he is able to drive and do some of his own shopping.

(Tr. at 18-20).

Plaintiff argues that the ALJ erred in considering

plaintiff's daily activities because the ALJ did "not seek

information regarding any difficulties the Plaintiff may be

39

having in fully performing any of those activities."  This
argument is without merit.

The record shows that plaintiff reported to his treating
doctors that he could move his neck fairly well (May 4, 2007), he
had participated in a benefit golf tournament at Tan-Tar-A (May
4, 2007), he had been getting along well for the last six months
(August 10, 2007), he had been helping his friends move a hot tub
(August 10, 2007), he had been doing a lot of heavy lifting
(August 10, 2007), he had been doing work around the home place
(July 8, 2008), he had been weed-eating around the lake (July 8,
2008), he was cleaning a loaded gun which at least suggests that
he had been using the gun since he lives alone (September 13,
2008), his grandfather had been working him harder cutting
firewood, etc. (February 6, 2009), he had been making longer
trips to see his grandfather in the hospital at the lake
(February 6, 2009), and he was trying to stay active mowing the
yard (June 12, 2009).  Regardless of whether plaintiff had any
difficulty doing these things, they are completely inconsistent
with the disabling symptoms to which he testified.

In addition to his daily activities, I note that Dr.
Khoshyomn recommended physical therapy for plaintiff's neck a few
months after his surgery and again the following year, but
plaintiff refused; the doctor who operated on plaintiff's neck

40

released him to return to work with no work restrictions or exertional limitations on February 9, 2007; Dr. Khoshyomn observed that plaintiff ambulated without difficulty on August 10, 2007, despite his alleged knee problems; plaintiff's claims of head injury are not supported anywhere in the medical record; Dr. Schmidt on multiple times recommended that plaintiff go to the Rolla Stress Center but plaintiff refused; when plaintiff went to the doctor complaining of fluid retention in his legs after using a weed-eater and working around his home, he did not even mention knee pain or neck pain; on August 7, 2008, when Dr. Schmidt actually performed an exam on plaintiff, it was normal; plaintiff continued to smoke throughout his years of treatment; on September 13, 2008, when plaintiff went to the hospital with a gunshot wound, he claimed to be taking no medications even though he had just gotten a refill of his Oxy-IR, a narcotic, a month earlier; plaintiff was discharged two days after his gunshot wound in stable condition and with no exertional restrictions; plaintiff apparently told Dr. Schmidt on September 26, 2008, that he had to save his own life by quickly applying a tourniquet to his leg, but the hospital records show that the wound did not compromise any blood vessels and there is no mention anywhere in the hospital records of a tourniquet or plaintiff using it to save his life; on June 5, 2009, plaintiff described his knee

problem as stable; on June 5, 2009, Dr. Wells performed a physical exam which was normal; on June 5, 2009, Dr. Wells observed that plaintiff could ambulate without difficulty; on June 5, 2009, x-rays of plaintiff's back were normal.

The evidence in the record overwhelmingly supports the ALJ's finding that plaintiff's subjective complaints of disabling symptoms are not credible.

## VII. OPINION OF DR. DANIEL SCHMIDT

Plaintiff argues that the ALJ erred in discounting the opinion of treating physician Dr. Daniel Schmidt. The ALJ had this to say about Dr. Schmidt:

> As for the opinion evidence, in a letter dated November 27, 2007, Dr. Schmidt observed that the claimant's persisting neck and headaches had made it "impossible to sit for any duration or stand or move about for any duration ...". Other concerns were identified as memory disturbance and depression. Dr. Schmidt concluded that with these symptoms in conjunction with chronic knee pain, the claimant "would find it not possible to maintain steady gainful employment of either desk work or active physical labor". In a questionnaire dated January 4, 2008, Dr. Schmidt estimated that the claimant could occasionally lift and/or carry up to 20 pounds, but could only sit/stand/walk for up to two hours each function in an 8-hour workday. He indicated that the claimant was limited by "chronic neck pain". Dr. Schmidt described the claimant's pain as severe. The undersigned has considered this opinion, but has accorded it little weight in drawing conclusions as to the claimant's remaining work-related abilities. It seems likely that such opinion was based more on the claimant's subjective reports of limitations than on actual clinical findings. Dr. Schmidt's progress notes do not suggest an individual who would be so limited. At an outpatient visit on March 19, 2007, the claimant reported that he was having intermittent numbness in his left arm and loss of feeling in his left leg which

42

had caused him to fall twice three days earlier. Dr.
Schmidt observed that the claimant appeared to have full use
of arms and legs. He said that the claimant had walked in
the hallway without limping. The claimant had good range of
motion of his neck. At his next visit with Dr. Schmidt on
April 6, 2007, the claimant reported that his shoulder and
neck were better without further falling or numbness. It is
notable that in a report dated February 9, 2007, Dr.
Khoshyomn, the claimant's surgeon opined that he was "very
happy with [the claimant's] improvement at this point"
(approximately three months after cervical spine surgery).
He said that he would "release him at this point to return
to work". He noted that the claimant was also "very
satisfied" with his improvement and progress.

(Tr. at 19).

A treating physician's opinion is granted controlling weight

when the opinion is not inconsistent with other substantial

evidence in the record and the opinion is well supported by

medically acceptable clinical and laboratory diagnostic

techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005);

Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ

fails to give controlling weight to the opinion of the treating

physician, then the ALJ must consider several factors to

determine how much weight to give the opinion: (1) the length of

the treatment relationship, (2) frequency of examinations, (3)

nature and extent of the treatment relationship, (4)

supportability by medical signs and laboratory findings, (5)

consistency of the opinion with the record as a whole, and (6)

specialization of the doctor. 20 C.F.R. § 404.1527(d)(2) - (5).

43

In this case the substantial evidence in the record as a whole provides no support whatsoever for the opinions of Dr. Schmidt.  Dr. Schmidt very rarely performed any type of examination.  He deferred formal examination on March 6, 2007; April 6, 2007; May 4, 2007; June 1, 2007; February 1, 2008; February 28, 2008; May 6, 2008; July 17, 2008; November 6, 2008; and May 21, 2009.

On March 19, 2007, Dr. Schmidt observed that plaintiff had full use of his arms and legs, walked in the hallway without limping even though plaintiff claimed to have suffered a loss of feeling in his left leg causing him to fall multiple times; he noted that plaintiff had told "stories" of recent falls and neck discomfort which indicates even he did not believe plaintiff's subjective complaints; and he observed that plaintiff appeared to have good neck motion.

On August 20, 2007 -- one week before plaintiff applied for disability benefits -- he, for the first time, reported memory disturbances which he attributed to several accidents during which he had hit his head "fairly hard."  There is no evidence in any medical records to support these accidents, plaintiff never mentioned them to any doctor before this date, and there was neither observation nor complaint of any memory problems prior to this visit.  Without performing any tests whatsoever, Dr. Schmidt

44

assessed memory loss, head injury history, and daily mixed headaches - which pretty much word for word describes plaintiff's new subjective complaints. On that same day, plaintiff, again for the first time, reported that he was "depressed at times." That simple allegation was enough for Dr. Schmidt to diagnose depression and prescribe an antidepressant.

On September 25, 2007 -- plaintiff's first medical appointment after filing for disability benefits -- he claimed he had suffered several head injuries that he now said included brain swelling. Despite observing that defendant was an alert, pleasant, non-ill appearing patient, and having performed no tests at all, Dr. Schmidt diagnosed memory disturbance, head injury history, and depression.

On January 4, 2008, Dr. Schmidt performed a rare physical exam after plaintiff complained of cold symptoms. Dr. Schmidt's exam did not cover any of the impairments that plaintiff claims cause his disability. When Dr. Schmidt examined plaintiff's throat, he did not make any mention of stiffness, tenderness, decreased range of motion, complaints of neck pain on exam, or any other symptom which would indicate that plaintiff had problems with his neck.

On January 11, 2008, plaintiff and his grandmother reported that plaintiff had been crying because his girl friend of three

45

years broke up with him.  Based solely on that, Dr. Schmidt assessed "acute stress reaction, nervous break."

Despite Dr. Schmidt's opinion that plaintiff is completely disabled due in part to his knee problem, Dr. Wells reported that plaintiff said his knee problem was stable.  Dr. Schmidt's opinion that plaintiff cannot do anything physical or even a desk job and is restricted in his ability to lift is belied by plaintiff's own testimony that he is able to do his own laundry, which clearly involves lifting.

There is nothing in Dr. Schmidt's medical records other than (1) essentially normal observations when an exam was performed (which was rare), (2) plaintiff's own subjective complaints which often changed from visit to visit, and (3) Dr. Schmidt's observations that plaintiff was not being truthful.  The specialist who treated plaintiff for his neck injury released him to return to work with no restrictions.  Dr. Schmidt, who is not a specialist, found that plaintiff could not do so much as a desk job.  Plaintiff was able to work jobs driving large stick-shift trucks with a clutch, yet Dr. Schmidt found that plaintiff's knee problem would prevent him from doing any job whatsoever.  Clearly Dr. Schmidt's opinion is not consistent with the other evidence in the record, nor is it supported by anything other than plaintiff's non-credible subjective complaints.

46

In addition to the above, I find that Dr. Schmidt
essentially acted as a drive-through restaurant specializing in
narcotics.  Whatever plaintiff asked for, plaintiff got:

On January 16, 2007, plaintiff told his third "story" of his
narcotic pain medication having been stolen out of his car.
Although the record indicates that Dr. Schmidt probably did not
believe this, he gave plaintiff new prescriptions for his
narcotic medication.

On March 6, 2007, plaintiff requested Trazodone and Dr.
Schmidt wrote him a prescription for Trazodone.

On March 19, 2007, plaintiff asked for an increase (by 20 mg
per dose) of OxyContin because he had suffered a loss of feeling
in his leg causing him to fall repeatedly.  Despite Dr. Schmidt
observing that plaintiff had full use of his arms and legs,
walked in the hallway without limping, had good neck range of
motion, and Dr. Schmidt referred to plaintiff's "story" of recent
falls, he increased plaintiff's dosage of OxyContin to the
precise amount requested by plaintiff.

On May 4, 2007, Dr. Schmidt "offered" to reduce plaintiff's
dose of narcotic pain medication.  Plaintiff declined; therefore,
his dose was kept the same.

On August 20, 2007, plaintiff requested an injection of
Toradol for headache relief, so Dr. Schmidt gave him one.  That

same day plaintiff said, for the first time, that he was
"depressed at times", so Dr. Schmidt gave him a prescription for
an antidepressant.

On January 4, 2008, plaintiff requested an increase by 20 mg
twice a day of his OxyContin because he said he was having "more
pain recently." Dr. Schmidt did not perform any kind of exam -
he simply wrote a new prescription increasing plaintiff's
OxyContin by 20 mg twice a day, despite the fact that plaintiff
had just been in for a refill of his Oxy-IR eight days earlier
and did not mention anything about his pain.

On January 11, 2008, despite plaintiff's history of coming
up with excuses as to why he lost his narcotic medication and
needed more, Dr. Schmidt gave plaintiff another new prescription
for his narcotics after he said he got upset and flushed his
OxyContin down the toilet.

On January 21, 2008 -- 20 days after having gotten new
narcotic prescriptions, plaintiff saw Dr. Schmidt and admitted he
had been out of his medication for the past three days.
Defendant's grandmother complained that defendant was on too much
pain medication. Dr. Schmidt observed that plaintiff had slow
reactions and speech slurring; however, he refilled plaintiff's
narcotic medications.

Case 6:10-cv-03312-REL   Document 17   Filed 09/04/11   Page 48 of 55

On February 28, 2008, plaintiff told Dr. Schmidt that he took himself off the Celexa (and this was just after plaintiff learned his disability application had been denied) and therefore, Dr. Schmidt told him to remain off that medication.

On May 6, 2008, plaintiff asked to increase his OxyContin due to "more neck pain and stiffness." Dr. Schmidt did not perform an exam, he simply increased plaintiff's OxyContin to the dosage plaintiff had requested.

On July 17, 2008 -- nine days after Dr. Schmidt had written plaintiff a new prescription for Oxy-IR, plaintiff told Dr. Schmidt that he wanted to try morphine instead of the OxyContin. Therefore, although plaintiff had never had any problem with OxyContin, Dr. Schmidt wrote plaintiff a prescription for morphine. No exam was done on this visit.

Two weeks later, plaintiff was seen by another doctor in Dr. Schmidt's office. Plaintiff complained of a bad reaction to morphine and asked for another refill of OxyContin. That doctor recommended that plaintiff have IV fluids and medication so that he would not get dehydrated since he claimed to be vomiting and suffering from diarrhea. Plaintiff said no. His mother told the doctor to give plaintiff a shot. The shot was given.

On August 7, 2008, plaintiff told Dr. Schmidt that he had gone to the hospital for a small bowel obstruction most likely

due to morphine pills. Dr. Schmidt assessed "small bowel obstruction" and "morphine intolerance" based solely on plaintiff's word, even though plaintiff had told Dr. Schmidt previously that he had had morphine before and had tolerated it well.

On September 23, 2008, plaintiff saw Dr. Schmidt and said his pain was "not relieved too well" despite having gotten new prescriptions the previous week from the hospital for Oxy-IR and OxyContin. This was after plaintiff told the ER that he was not taking any medications, although his narcotic medication had just been refilled the month before. Dr. Schmidt refilled plaintiff's OxyContin and changed his Oxy-IR to Roxicodone.

Two weeks later, plaintiff claimed the Roxicodone was not working any better than the Oxy-IR, so he asked to go back to Oxy-IR. Again, Dr. Schmidt obliged and wrote plaintiff a new prescription for Oxy-IR.

On November 14, 2008, plaintiff said he had been served papers in a court case related to the charges that he altered his OxyContin prescription. Although Dr. Schmidt recalled that plaintiff previously admitted he had done that, Dr. Schmidt continued to write narcotic prescriptions at plaintiff's request.

On February 6, 2009, plaintiff requested additional pain medication due to his working harder cutting wood. This was

50

about three months after Dr. Schmidt's last letter in support of
plaintiff's disability benefits in which Dr. Schmidt said
plaintiff could not work at all.  Plaintiff also said he had
fallen on a porch and hit his shoulders.  Dr. Schmidt observed no
injury to plaintiff's shoulders.  However, on plaintiff's
request, Dr. Schmidt increased plaintiff's OxyContin and refilled
his Oxy-IR.

Two weeks later, plaintiff changed his story about the slip
and fall and said he actually landed flat on his back, and
therefore, he needed an early refill of his narcotics obviously
because he had been taking more than had been prescribed.  Dr.
Schmidt did as requested.

On April 28, 2009, Dr. Schmidt wrote a letter in support of
plaintiff's disability application and indicated that plaintiff
had daily pain and stiffness in his left knee.  However, the last
time plaintiff had even complained of knee pain was July 17, 2008
-- about nine months earlier.  In addition, five weeks hence
plaintiff would describe his knee problem to another doctor as
being "stable."

On May 21, 2009, plaintiff complained of back pain after
physical activity, yard work, and longer trips to visit his
grandfather.  Plaintiff said he needed an early refill of his
narcotics, again because he had been taking more than prescribed.

51

Dr. Schmidt performed no exam -- he wrote the early prescription as plaintiff had requested.  In addition, he wrote plaintiff another prescription to fill in 30 days relieving plaintiff of the need to have a doctor visit before getting more narcotics.

On June 12, 2009, plaintiff admitted to Dr. Schmidt during an appointment for pain medication refill that he took excessive pain medication beyond the amount prescribed.

The only time Dr. Schmidt limited plaintiff's narcotic medication against plaintiff's wishes was when plaintiff's grandmother said she was paying for the medicine and could only afford enough to get plaintiff through the end of the month, so that is how Dr. Schmidt wrote the prescription.

The record is very clear in this case -- Dr. Schmidt's treatment and opinions regarding plaintiff's ability to work were dictated by his patient and were not supported by exams, tests, or observations and were often contradictory to exams and observations.  The disability form completed by Dr. Schmidt repeatedly asks for signs, symptoms or medical findings supporting his opinions; and Dr. Schmidt repeatedly wrote nothing more than plaintiff's complaints.  He left blank all objective support for his conclusions and admitted on the form that they were supported by nothing more than subjective complaints of pain.  He relied on plaintiff's unsubstantiated complaints of

52

multiple closed head injuries resulting in memory disturbance despite the fact that he had never (and would never) observe any evidence of memory disturbance.

The ALJ did not err in giving no weight to the opinion of this treating physician.

## VIII. COMBINATION OF IMPAIRMENTS

Finally plaintiff argues that the ALJ erred in not considering the combined effect of plaintiff's impairments. "The Administrative Law Judge did not fully take into account the combined effects of the Plaintiff's depression, anxiety, memory problems, headaches, effects of breaking his neck in 2006, which required surgery and has had four knee surgeries." Plaintiff's argument is without merit.

There is no evidence that plaintiff suffered anything other than minor limitations due to any mental impairment. On August 10, 2007, he had normal mood and affect, was alert and oriented. He did not raise any allegation of memory disturbances until a week before he applied for disability benefits, and then he blamed his heretofore unheard of memory problems on several accidents during which he hit his head fairly hard. There is no medical evidence supporting these allegations. A month later, plaintiff was alert, pleasant and non-ill appearing. On November 6, 2007, Dr. Burstin found that plaintiff's mental impairment was

non-severe.  By November 27, 2007, plaintiff had stopped taking Celexa on his own, described his depression as stable, and did not get a refill of his antidepressant.

The next mention of mental issues occurred on January 11, 2008, after plaintiff's girl friend left him.  It was suggested that he receive treatment at a stress center, but he declined. The following month, the stress center was again recommended, but he declined.

On May 6, 2008, plaintiff said his mood was stable and he was not taking Celexa.  He described his "nerves" as stable. Plaintiff reported on July 17, 2008, moodiness and temper outbursts, but he had not been taking his antidepressant.  On September 13, 2008, he was described as alert, oriented, friendly and cooperative.

At the hearing, plaintiff's grandmother testified that he did not seem to be suffering from depression when he shot himself.  It was only on prompting from plaintiff's counsel that Ms. Duncan changed her testimony.  Even Dr. Schmidt noted that plaintiff was "not affected too much" by any mental impairment. There is no evidence (other than plaintiff's non-credible allegations) that he ever suffered from memory problems.  No memory tests were ever performed and there is no evidence of difficulty remembering things.

54

Plaintiff's knee surgeries occurred before his alleged onset date and he was subsequently able to work full-time jobs driving large trucks with a clutch.  He was able to carry a hot tub, use a weed-eater, take care of his home, play golf, and live alone -- indicators that his knee problem did not get that much worse.

Plaintiff's neck surgeon released him to return to work without restrictions three months after his neck surgery.

The ALJ adequately considered the effects of all of plaintiff's credible impairments.

## IX.  CONCLUSION

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_____
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 2, 2011

Case 6:10-cv-03312-REL   Document 17   Filed 09/04/11   Page 55 of 55